IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FOREST GROVE SCHOOL DISTRICT,                          Civ. No. 3:12-cv-01837-AC

                              Plaintiff,                    OPINION AND ORDER

               v.

STUDENT,

                              Defendant.

STUDENT,

                              Counterclaimant
               v.

FOREST GROVE SCHOOL DISTRICT,

                              Counterdefendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff-Appellant Forest Grove School District ("the District") seeks review of a

September 12, 2012 final order by Administrative Law Judge Jill Marie Messecar ("the ALJ")

finding the District in violation of the Individuals with Disabilities in Education Act ("IDEA").

Defendant-Appellee Student ("Student")[1] cross-appeals, and asks the court to reverse isolated

_____

[1] Student is a minor, and her parents have sought to retain her anonymity throughout the
pendency of this action.  The court refers to her only as "Student" throughout its Findings and

portions of the ALJ's opinion.  The court affirms in part and reverses in part the ALJ's decision.

*Factual Background*

In 2005, while living in Maine, Student was evaluated for, and diagnosed with, speech, language, and communication deficits.  (Ex. S1 at 4-5.)  Due to her handicaps, Student's school provided her special education services in accordance with the IDEA.  (Ex. S3 at 1.)  In the summer of 2005, Student and her parents ("Parents") moved to Forest Grove, Oregon, where Student enrolled in Forest Grove School District. (Administrative Hearing Transcript ("Trans.") at 3083-84.)  During the '05-'06 school year, the District administered an occupational therapy evaluation and psychological evaluation, which indicated Student had deficits in information processing and comprehension.  (Ex S3 at 5.)  On that basis, the District administered special education services

Additional evaluations followed.  In 2008, Student's primary care physician signed a medical statement to assist the District in determining Student's eligibility for special education under the IDEA.  The District administered several educational evaluations, which showed Student was average in the areas of language and expression, low-average in math calculation and reading, and low in reading comprehension and math reasoning.  (Ex. S9 at 2.)  The District also evaluated Student for suspected disabilities, and determined Student qualified for IDEA services because of her autism spectrum disorder ("ASD").  (Ex. S10 at 4.)

The District also administered a full psychological assessment in May 2008.  (Ex. S12 at 1.)  The assessment consisted of in-person observation, and administration of the Behavior Assessment System for Children, 2nd Edition ("BASC-2"), and the Conners' Rating Scale ("Conners Assessment").  (Ex. S12 at 1.)  The resulting report ("2008 Psychological Report")

_____

Recommendation.

showed Student "was easily distracted, had a difficult time asking for help when she did not understand an assignment, and required prompts from teachers to stay on-task." (Ex. S12 at 2.) When interviewed for the 2008 Psychological report, Student's teachers indicated Student had "clinically significant" levels of anxiety, learning problems, school problems, atypicality, withdrawal, functional communication, cognitive problems, inattention, hyperactivity, and Attention Deficit Hyperactive Disorder ("ADHD"). (Ex. S12 at 4.) On the basis of the 2008 Psychological Report, the school psychologist diagnosed Student with ADHD. (Ex. S12 at 4.)

I.  May 2009 IEP

Student's parents and teachers met in May 2009 to create Student's individualized education plan ("IEP") for the 2009-2010 school year ("May 2009 IEP"). Student qualified for IDEA special education services under the categories of ASD and Other Health Impairment ("OHI"). (Ex. S16.) Apart from addressing Student's learning difficulties, Student's IEP addressed Student's anxiety and self-management problems. (Ex S16.) The May 2009 IEP provided Student with specially designed instruction in language arts and math; thirty minutes per week of speech and language therapy; individual instruction to aid student with her anxiety and self-management problems; and eight hours per week of writing instruction over summer vacation. (Ex. D3 at 2.) To accommodate Student's reading problems and cognitive impairments, the May 2009 IEP also instructed Student's teachers to give Student extra time to complete tests and assignments and allow Student to retake tests on which she did poorly. (Ex. D3 at 2.)

The May 2009 IEP team noted in Student's "present levels of academic achievement and performance" ("Present Levels") that Student has problems in reading, writing, and math, and tends to "monopoliz[e] the teacher's attention" by constantly asking for reassurance and asking

off-topic questions.  (Ex. D3 at 7.)  The present levels also indicate that Student has a very low IQ, but "demonstrated greater achievement on standardized testing than would be suggested by her obtained cognitive scores."  (Ex. D3 at 7.)  The IEP also dictates that Student take the Oregon Assessment of Knowledge and Skills ("OAKS"), a standardized test which all Oregon students must take in order to earn a diploma.  Ultimately, the IEP team placed student in a general education classroom setting with a shared instructional assistant.  (Ex. D3 at 13.)  The IEP team chose this placement in lieu of special education placement because it allowed student to gain social skills though peer modeling while retaining one-on-one instruction from her instructional aide.  (Ex. D3 at 13.)

II.  April 2010 IEP

In anticipation of the next IEP meeting, the District administered an educational evaluation of Student using the Woodcock Johnson III achievement test.  (Ex D9.)  The District proposed the reevaluation in order to "update information about [Student's] current levels of academic performance on a standardized scale."  (Ex. D9.)  The evaluation indicated low-average performance in "academic knowledge, basic reading, and brief reading; low performance on oral expression, broad reading, and math calculation; and very low performance on reading comprehension, broad math, brief math, written expression, math reasoning, fluency with academic tasks, and ability to apply academic skills.  (Ex. S21 at 1.)

Student's "specially designed instruction" increased significantly in the April 2010  IEP. The District provided Student with special instruction in reading, writing, math, and self-management; and provided Student with thirty minutes per week of speech and language therapy.  (Ex. D12 at 3.)  The IEP also provided Student with the following modifications and accommodations to her educational curriculum:

- verbal responses to testing;
- second row seating or close proximity to the teacher;
- three additional days to complete tests and assignments;
- visual supports to assist comprehension;
- an organizational planner with assignments;
- access to copies of lecture notes;
- alternate testing location upon student's request;
- shared instructional assistant support; and
- model/example multi-step math problems.

(Ex. D12 at 2-4.)

Student's April 2010 present level statement indicates Student's "oral language skills were found to be low when compared to others at her age level." (Ex. D12 at 7-8.) It also noted Student's continued problems with self-management and anxiety. The self-management portion of the present level statement is significantly more detailed than the May 2009 IEP, and contains a progress report suggesting Student was more independent and less anxious than she was prior to the May 2009 IEP. (Ex. D12 at 7-8.) Similar to the May 2010 IEP, the April 2010 IEP provided that Student take the OAKS with accommodations in reading/literature, mathematics, writing, and science. (Ex. D12 at 9.)

The IEP team changed Student's placement in the April 2010 IEP to "[a] combination of special education and general education classes with pull out for tutorial and speech and language services," because "[Student] will have access to content and electives in general education and will receive instruction in core areas at the level she is learning." (Ex. D12 at 17.) Ultimately, the IEP team determined that the previous placement did not provide Student with instruction commensurate with her abilities. The April 2010 IEP does not have a transition plan, and does not mention that Student was slated to take the ACT during ninth grade, which contained a career interest survey. (Tr. at 2689:23-25.) Neither the IEP or the notes from the IEP make reference to transition services or a comprehensive transition plan. (Ex. D12, D13.)

As provided in the IEP, the District prepared a progress report for Parents in June 2010. (Ex. D16.)   The report provides a short summary of Student's progress toward the AGs and STOs drafted for her IEP.  The Literature progress notes show that Student was able to identify the main idea of a sentence with 80% accuracy.  (Ex. D16 at 1.)  The progress notes indicated that Student was reading at a fifth grade level, with 70% accuracy in reading comprehension.  In addition, the self-management notes show that Student was asking for assistance from the teacher roughly one third of the time.  According to Parents, they did not receive these progress reports until the summer of 2011.

III.  Additional Psychological Evaluations

In December 2010, doctors at the Child Development and Rehabilitation Center ("CDRC") evaluated student for autism and released a report summarizing the doctors' conclusions ("the CDRC Report").  The CDRC team concluded that Student did not have ASD, and diagnosed Student with mild intellectual disability, anxiety disorder, ADHD, and macrocephaly.  (Ex. D15 at 1.) The CDRC doctors noted that Student's social problems and fearful nature resulted from anxiety instead of ASD and concluded that Student's reading and communication deficits were caused by a "receptive-expressive language disorder."  (Ex. D15 at 5.)  The CDRC doctors recommended Student undergo additional psychiatric evaluations and seek therapy to reduce her anxiety.  (Ex. D15 at 5.)

Early in 2011, G. Robert Buckendorf, Ph.D. ("Dr. Buckendorf") evaluated Student for communication problems.   (Ex. D17 at 1..)   In his report ("the Buckendorf Report") Dr. Buckendorf observed that Student "is able to use a number of elaborate sentences to communicate with others," but "does not engage in conversational turn takes . . . ."  (Ex. D17 at 1.)   Additionally, Dr. Buckendorf observed that Student used appropriate non-verbal

communication cues and her "speech clarity, fluency, and vocal quality were within normal limits."  (Ex. D17 at 1.)  Dr. Buckendorf diagnosed student with "a mixed receptive and expressive language disorder including a disorder of pragmatic language."  (Ex. D17 at 2.)  He recommended Student seek ongoing psychological treatment as well as treatment "in the area of conversational language . . . [including] turn take [sic] and holding attention of her listener, written language, and should include both gestural signals as well as visual supports to help her be more pragmatically appropriate."  (Ex. D17 at 1.)

Parents forwarded both the CDRC Report and the Buckendorf Report to members of the IEP team before the team met to draft Student's March 2011 IEP.  Upon receiving the Buckendorf Report, District personnel spoke with Dr. Buckendorf and discussed recommendations.  Although the District disagreed with the CDRC team's conclusions the IEP team nonetheless reviewed the CDRC report and integrated the CDRC's data on Student's IQ into Student's March 2011 IEP.  (Tr. at 1985-1989.)

In preparation for the March 2011 IEP, Dr. Amanda Morris ("Dr. Morris"), the District psychologist administered a new psychological evaluation (the "Morris Report").  (Ex. D20.) The methods used in the March 2011 psychological evaluation were nearly identical to those used in the 2008 psychological evaluation.   (Ex. D20 at 1.)  The Morris Report showed that Student had clinically significant levels of anxiety, inattention, hyperactivity/impulsivity, and executive functioning.  It also showed Student had "at risk" levels of depression, hyperactivity, social skills, functional communication, inattention, and internalization of problems.  During Morris's classroom-observation sessions, Student exhibited "inattentive behaviors during classroom observations."  Ultimately, Morris recommended that Student's parents and teachers: (1) limit distractions in Student's working environment by removing distractions and minimizing

proximity to distractions while maintaining access to teachers; (2) maximize eye contact while giving directions; (3) encourage Student to work in small groups with peers "who can serve as role models for positive social behavior"; and (4) give Student "[g]uided observations of social interactions . . . [to] increase her social skills."  (Ex. D20 at 4.)

IV.  March 2011 IEP

One day after the Morris Report was released, the IEP team met to draft Student's March 2011 IEP.  The team once again found Student eligible for special education based on other health impairment and ASD.  (Ex. D24 at 1.)  Based on the CDRC and Buckendorf reports, the IEP Team also based eligibility on mild intellectual disability.  During the IEP meeting, Mother remarked that she did not care what eligibility classification Student received so long as the District provided Student with enough educational services "to support her now and in the future."  (Ex. D25 at 1.)

The March 2011 IEP provided the specially designed instruction in reading, writing, and transition math.  Again, Student was provided thirty minutes per week of speech and language therapy.  (Ex. D24 at 2-3.)  The IEP also provided Student with modifications and accommodations to her curriculum:

- visual supports for homework and class work;
- modified tests and assignments in general education classes;
- alternate location for completing tests and assignments upon student request;
- copies of notes upon student request;
- an additional week to complete assignments and tests;
- a voice recorder to record lectures and classes; and
- second-row seating in all classes.

(Ex. D24 at 2-3.)  Student's March 2011 present level statement is less detailed than those in previous IEPs.  For example, the section explaining how Student's disability affects her involvement and progress in the general education curriculum merely states that Student's need

for specially designed instruction required her to enroll in special education classes.  The March 2011 IEP provides that Student will take the OAKS test in reading/literature, mathematics, writing, and science, but does not indicate whether Student will be provided with accommodations while taking the test.  (Ex. D24 at 9.)  Notably absent from the March 2011 IEP is a self-management curriculum to help Student control her anxiety.

The March 2011 IEP includes Student's first transition plan, which outlines the services the District will provide to prepare Student for life after high school.  The March 2011 transition plan provides that Student is expected to graduate in June of 2013 with a modified diploma, and "[w]ithin one year of completing school district services; [Student] will attend community college part time; will live with her parents; and will access her community by driving herself." (Ex. D24 at 8.)  In addition, the plan specifies that Student will participate in a "work experience program during her senior year," a "community living program" in which she will learn skills of daily living, and will enroll in a course of study to learn practical skills which will prepare her for living independently.  (Ex. D24 at 8.)

In June 2011, the District prepared new progress notes.  Like previous progress reports, the June 2011 progress report indicates that Student made some progress in language, transition reading, transition writing, and transition math since the March 2011 IEP, but had not yet met her STOs in those subjects.  Student's progress notes for transition reading are not measured in relation to Student's STOs in that area, but instead references the "STAR assessment," and notes that Student should "maintain a minimum of 60 minutes independent reading daily."  (Ex. D27 at 1.)  Parents testified that the District did not deliver the June 2011 progress notes until September 2011.  (Tr. at 3161-62.)

In the summer of 2011, Student began acting strangely and exhibiting signs of psychosis.

She was pacing, acting frightened and disconnected, and told Parents that she had hurt herself. Parents took Student to the emergency room, where a doctor suggested Student be admitted to a psychiatric hospital. Parents believed admitting student to an in-patient mental health facility would only exacerbate Student's condition. Instead, parents took Student to Dr. Ken Ensroth ("Dr. Ensroth"). (Ex. S161.) Dr. Ensroth observed student for several weeks, and concluded that Student was suffering from "Psychotic Disorder: Not Otherwise Specified." (Ex. S161.) Dr. Ensroth prescribed Student anti-psychotic medication and antidepressants and recommended that Parents observe Student twenty-four hours per day.

V. Parents' Request for Additional Services

The IEP team convened again in September 2011 to plan Student's 2011-2012 class schedule. At the meeting, Parents voiced their concern that District budget cuts would eliminate a science class Student needed in order to participate in Future Farmers of America ("FFA"), a student group focusing on agriculture. The team even discussed creating a before-school "zero-hour class" especially for Student so she could continue participating in FFA. Parents were dissatisfied with Student's math placement and proposed that Student take pre-algebra instead of transition math in order "to learn more basics." (Ex. D29 at 2.) Mother also notified the IEP team that Student experienced a psychotic episode over the summer. The IEP team did not push Mother to reveal more because Mother was visibly upset while speaking about Student's mental health episode. (Tr. at 2461:14-16.Without meaningful information about Student's psychotic episode, the District concluded that Student was no longer experiencing symptoms, and made no adjustments to the IEP on account of Student's mental health problems. (Tr. at 2461.)

Finally, Parents requested that the District increase the amount of speech and language therapy to two hours per week at school plus three hours per week out of school. The District

told Parents that Student was making progress with the current levels of therapy, and would not increase the amount of speech and language therapy without data to support an increase. After the meeting adjourned, two team members met privately and agreed to temporarily increase Student's speech and language time to one hour per week in order to gather data. (Tr. at 2455-57.) The team members notified Parents of the change by telephone, but did not send PWN until November 2011, when the District permanently amended Student's IEP to provide one hour per week of speech and language therapy. (Tr. at 2455-57; Ex. S100.)

Parents remained concerned that Student was not getting enough services and, in September 2011, requested "another full evaluation." (Ex. S68 at 1.) In particular, Parents wanted the District to evaluate Student for a communication disorder, fine motor skills, occupational therapy needs, and a reevaluation for ASD. (Ex. S72 at 1.) The IEP team convened a planning meeting on October 3, 2011, to consider Parents' requests. (Ex. S79 at 1.) Ultimately, the District denied Parents' request for a full evaluation because it had evaluated Student's situation just six months prior to the meeting. (Ex. S79 at 4, S78.)

Although the District refused to initiate a full reevaluation, it reviewed Student's files and directed its occupational therapist to meet with Parents and Student. (Ex. S78.) Thereafter, Melissa Howarth ("Howarth"), the school's occupational therapist, administered an occupational therapy evaluation. (Ex. S96 at 1.) During the evaluation, Student "showed some strengths and weaknesses in her fine motor skills," and received scores in the "very low range for manual coordination, but demonstrated some average abilities with upper-limb coordination." (Ex. S96 at 1.) Despite Student's weaknesses, Howarth observed that Student's handwriting was "neat," "legible," and featured proper spacing between words. (Ex. S96 at 1.) Howarth concluded that Student's coordination deficiencies had no effect on Student's education, but recommended that

Parent practice tasks requiring manual dexterity at home on a regular basis.  (Ex. S96 at 2.)

The IEP team met yet again on November 3, 2011 to update Student's IEP.  At the meeting, Parents expressed concern with the District's failure to address Student's poor social skills and anxiety.  The team discussed strategies to improve Student's social skills, but did not talk about Student's anxiety problems. At the meeting, Parents advocated for a change in Student's math and reading present levels, despite the fact that Student's math and reading teachers believed Student was being challenged under the educational curriculum in place at the time.

Shortly after the November IEP meeting, Parents emailed updated evaluations from Dr. Ensroth and Dr. Buckendorf to Student's case manager.  Dr. Ensroth's updated report, which he completed in October 2011, was a one-page letter which detailed Student's psychotic episode and recommended that Student receive counseling sessions to help manage her anxiety.  He opined that Student's anxiety likely exacerbated her academic and social problems.  (Ex. D34.) The Buckendorf's report was largely identical to the report he provided the IEP at the beginning of 2011.  In it, Buckendorf recommended:

> individual and group [speech and language] treatment at school for several hours a week. She only has a limited amount of time left in school before she will be required to be an independent learner.  She must have a better grasp of these skills so that she can be as successful as possible when she leaves school.

(Ex. S105 at 5.)  Student's case manager forwarded the documents to the rest of the IEP team, but took no further action.

The IEP team met yet again on November 14 to finalize Student's November 2011 IEP. (Ex. D41 at 1.)  Parents renewed their objection to Student's math and reading present levels as well as to the District's refusal to provide occupational therapy.  (Ex. D41 at 3.)  The District refused to change student's present levels because it believed they were accurate.  Finally, the

IEP team discussed the thirty-minute increase in Student's speech and language therapy. Student's speech and language therapist opined that Student made no more progress under the new therapy regimen than she had previously.   Nonetheless, the District maintained the one-hour-per-week schedule in an attempt to "appease" parents. (Tr. at 2473:24-2474:4)

VI.  November 2011 IEP

The District finalized Student's updated IEP on November 14, 2011 (the "November 2011 IEP").  The November 2011 IEP provided specially designed instruction in transition reading, transition writing, and transition math, and stated that Student receive one hour per week of speech and language therapy.  (Ex. S99 at 2.)  Student also received the following accommodations and modifications:

- • visual supports for homework and class assignments;
- • modified tests and assignments for general education classes;
- • alternate locations for completing tests and assignments;
- • copies of lecture notes;
- • up to one week extended time to complete tests and assignments;
- • a voice recorder in science classes;
- • second row seating;
- • modified essay questions on all proficiency tests; and
- • test questions read aloud on all general education proficiency tests.

(Ex. S99 at 2-4.)  Further, at Mother's suggestion, the IEP team exempted Student from taking the OAKS test during the 2011-2012 school year.  Like the March 2011 IEP, the November 2011 IEP omitted a self-management curriculum.  The IEP team placed Student in a "combination of special education and general education classes with pull-out for tutorial services and speech and language services" because it allowed Student to develop social skills in general education classes while maintaining access to special education instruction "at the level she is learning." (Ex. S99 at 15.)

*Procedural Background*

Parents remained dissatisfied with Student's educational plan after the November 2011 IEP and filed a request for a due process hearing with the Superintendent of Public Instruction. (ALJ Op. at 44.)  The Oregon Department of Education referred the case to the state Office of Administrative Hearings, who in turn assigned the case to ALJ Jill Marie Messecar.  (ALJ Op. at 1.)  The ALJ held a multi-day hearing between April 16, 2012 and June 29, 2012 (the "Due Process Hearing"). (Tr. Vols. I-XII.)

A recitation of each witness's testimony is unnecessary and duplicative, as most facts relevant to the court's analysis are contained in the ALJ's recitation of facts and the parties' exhibits.  However, the court includes here that hearing testimony which informs its analysis.  In particular, the testimony of the parties' expert witnesses, Dr. Amanda Morris ("Dr. Morris") and Christina Moore ("Moore"), explains Student's condition as well as the adequacy of the District's actions.

On May 31, 2012, the District called Dr. Amanda Morris ("Dr. Morris") to testify at the administrative hearing.  Dr. Morris, the District's clinical psychologist, testified about Student's anxiety and the 2011 psychology evaluation which she administered.  (Tr. at 1912-13.)  When asked why she did not recommend the District address Student's anxiety problems, Dr. Morris testified that clinically significant levels of anxiety do not automatically suggest that the anxiety affects Student's education.  (Tr. at 1939:11.)  In fact, because Student's anxiety manifested itself through perseveration and a need for constant reassurance, Dr. Morris disagreed with OHSU's diagnosis of an anxiety disorder.  (Tr. at 1986.)  Instead, Dr. Morris concluded Student's anxiety was a symptom of her ASD.  (Tr. at 1941-42.)  She opined that treating Student's ASD through accommodations and modifications was a more suitable treatment than the daily anxiety counseling recommended by Dr. Ensroth because, "something like that would

be more [appropriate for] an individual whose anxiety was so dramatic that they couldn't leave their house, that they couldn't function without help, that they couldn't come to school, having chronic panic attacks." (Tr. at 1965:6-13.)

Dr. Morris also testified about Student's cognitive abilities and IQ scores. (Tr. at 1915-1930.) She explained that, although Student had average levels of processing ability, she is very low functioning, and "would have a lot of difficulty accessing general education without a lot of help." (Tr. at 1928:1-3.) In addition, because Student is low functioning, "[academic] progress would be slow. It could plateau." (Tr. at 1932:14.) Due to the likelihood of academic plateau, she opined, it is common for intellectually disabled students in high school to focus less on academics and more on life skills that allow the student to become more independent. (Tr. at 1929:21-1930:10.)

Student's expert, Christine Moore ("Moore"), also testified at the hearing. Moore is the director of special education programs for Lewis and Clark College, and in that capacity instructs aspiring school administrators and special education teachers on best practices for creating IEPs. (Tr. at 3900:4-6, 3963:22-3964:1.) After reviewing Student's file, Moore agreed with Dr. Morris that Student was very low functioning, and testified that it was unlikely Student understood her school work, even with accommodations and modifications. (Tr. at 3923.) Moore, who has experience creating IEPs for school districts, testified that some of the IEPs were inadequate. In particular, Moore believed that the November 2011 transition report lacked the following:

> [c]ounseling, social skills training, more practical life skills training, employment and life management outside of the academic world. If [Student is] going on after school . . . [m]ore information about what the course of study is intended to be [at community college]. Is she going to live with her parents? . . . Is there any work being done in other areas?

(Tr. at 3954:1-11.)   In addition, Morris testified that, in her opinion, the District did not do

enough to treat student's anxiety.   She explained:

> [b]ecause of the significant reports of anxiety . . . I would expect to see a program that
> addressed self-help skills, life skills, personal management skills, counseling, social
> skills, individually and in group, language skills . . . All of those pieces together I would
> expect to be part of her program.

(Tr. at 3946: 5-17.)   On cross examination, Moore testified that she based her conclusions only

on a file review, and admitted never personally observing Student.   (Tr. at 3918-19.)   She

nonetheless disagreed with the District's contention that Student's anxiety did not affect her

education, and stated that since Student's teachers were "the reporters of clinically significant

anxiety," it was difficult to believe that Student's education was unaffected by her anxiety.   (Tr.

at 3973: 5-12.).

After reviewing the evidence, the ALJ made the following conclusions of law:

1.   District denied Parents the opportunity to meaningfully participate in the Student's
education during the 2009-2010, 2010-2011, and 2011-2012 academic years, in violation
of IDEA and its implementing Oregon Revised Statutes (ORS and Oregon
Administrative Rules (OARs); and

2.   District failed to identify Student as a student with a disability in all areas of disability
during the 2009-2010, 2010-2011 and 201-2012 academic years, in violation of the IDEA
. . . ;

3.   District failed to evaluate Student in all areas of suspected disability during the 2009-
2010, 2010-2011 and 2011-2012 academic years, in violation fo the IDEA . . . ;

4.   District failed to provide Student with a free appropriate public education (FAPE)
during the 2009-2010, 2010-2011 and 2011-2012 academic years, in violation of the
IDEA . . . ;

5.   District provided an appropriate placement for Student during the 2009-2010, 2010-
2011 and 2011-2012 academic years.

(ALJ Op. at 44-45.)   The ALJ ordered the District to provide: (1) a comprehensive evaluation to

determine Student's present levels; (2) an IEP meeting to draft a new IEP based on the

OPINION AND ORDER                          16                              [RMD]

comprehensive evaluation; (3) "two hours of direct transitional reading instruction for every week of instruction Student should have received between September 2010 and December 6, 2012"; (4) two hours of transition math instruction for every school week between September 2010 and December 6, 2012; (5) sixty minutes of anxiety counseling per week until Student turns 21; (6) a driver's education course; (7) Specially designed instruction which employs "the learning techniques described in the 2005 and 2008 evaluations . . . and described by Mr. Larsen in the November 2011 IEP"; and (8) training for District staff on IDEA protocol for writing and implementing IEPs.

The District appealed the ALJ's decision to this court on October 12, 2012. In its complaint, the District alleges the ALJ erred both in her fact-finding and legal analysis, and it asks the court to reverse the ALJ's decision and vacate the remedy. (Compl. at 9.) Student filed an answer and counter-appeal, seeking to reverse specific sections of the ALJ's opinion and award additional remedies. (Answer and Countercl. at 13-14.) On December 30, 2013, the court held oral argument on the appeal and cross-appeal.

## Legal Standard

The IDEA permits a party aggrieved by an ALJ's decision to file an administrative appeal in a U.S. District Court. 20 U.S.C. § 1415(i)(2)(A). The court reviews the full administrative record as well as any additional evidence introduced by either party and must base its decision on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(i)-(ii). The preponderance of the evidence standard is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982). As the Supreme Court explained in *Rowley*, "[t]he very importance which Congress has attached to compliance with certain

procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at naught." *Id*.

*Discussion*

In 1990, Congress passed the Individuals with Disabilities in Education Act ("IDEA"), which amended its predecessor, the Education for All Handicapped Children Act ("EHCA"). *Mark H. v. Lemahieu*, 513 F.3d 922, 928 (9th Cir. 2008). The IDEA provides federal grants to state and local educational agencies to improve educational opportunities for handicapped children. *Id*. at 928-929. Before Congress passed the EHCA in 1975, "a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" *Rowley*, 458 U.S. at 179 (1982). In an attempt to create realistic educational opportunities for handicapped students, the EHCA and IDEA require school districts and state educational agencies to adopt procedures to provide full educational opportunities for children with disabilities. 20 U.S.C. § 1400. These plans must outline policies and procedures to locate, identify, and evaluate disabled students and provide those students with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412. Failure to abide by IDEA procedures may result in denial of financial grants to state educational bodies. 20 U.S.C. § 1400.

The IDEA provides schools with tools with which to provide a FAPE to disabled students. For example, schools may facilitate a student's access to the subject matter of his or her classes by modifying the student's substantive curriculum. Schools may also provide accommodations, which are procedural changes and learning aids, which also increase a student's ease of access of substantive material. 20 U.S.C. § 1411(e)(2)(C)(ix). Despite the tools a school district has to alter a disabled student's school curriculum, congress expressed its

intent in the IDEA that schools maximize the extent to which disabled students "are educated with children who are not disabled." 20 U.S.C. § 1412(5)(A).

The court analyzes the adequacy of school-district action in IDEA cases according to a two-step framework:

> First, has the state complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the state has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206-07. Congress placed a great deal of importance on the procedural safeguards in the IDEA. *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007). "Procedural compliance would in most cases assure much if not all of what Congress wished in the way of substantive content of an IEP." *Id.* However, not all procedural defects violate the IDEA. *Id.* A violation of the procedures articulated in the IDEA constitute substantive violations only if it results "in the loss of educational opportunity or seriously infringes on the parents' opportunity to participate in the IEP formation process." *Id.* (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 2006) *superseded by statute on other grounds by* Individuals with Disability in Education Act Amendments of 1997, Pub. L. 105-17 § 614(d)(1)(B), 111 Stat. 37, *as recognized in Capistrano Unified School Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995))


I.  Deference to the ALJ

Each party claims that some portion of the administrative decision is poorly reasoned and should be entitled to no weight. Parents and Student each claim that the ALJ's decisions in regards to the OAKS testing, the failure to explain Parents' right to an independent evaluation,

and the districts non-use of Parents' privately obtained evaluations "were made contrary to the evidence and without thorough consideration or support."   The District takes issue with the remainder of the decision, and claims that the ALJ failed to adequately cite witness testimony in support of her findings of fact and conclusions of law

Although the court reviews "de novo the ultimate determination of the appropriateness of the educational program[,]" it is nonetheless required to give the ALJ's decision "due weight." *Capistrano*, 59 F.3d at 891.   The degree of deference due to the ALJ is largely "a matter for the discretion of the courts."  *Id*. at 891, (*quoting Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)) "The amount of deference accorded to the hearing officer's findings increases when they are thorough and careful."   *Capistrano*, 59 F.3d at 891 (giving "quite substantial deference" to the ALJ's opinion because the twenty-six page single spaced opinion carefully and thoroughly explored the issues raised by the claimants).  "[C]ourts are to consider the findings 'carefully and endeavor to respond to the hearing officer's resolution of each material issue,' but the court is 'free to accept or reject the findings in part or in whole.'"  *Id*. at 891.

Although the ALJ's sixty-eight page single spaced opinion is lengthy, it is not careful and thorough, and the court affords it little deference.  The ALJ describes in detail many of the exhibits on record.  She includes large block quotes of each IEP, and describes each IEP meeting as described in the IEP meeting notes.  However, the ALJ makes little to no mention of witness testimony taken over multiple days of administrative hearing.  Most importantly, the ALJ does not discuss the hearing testimony of the parties' experts, which sheds significant light on the issues presently before the court and often contradict the ALJ's conclusions of fact and law.

The ALJ's conclusions of law are also entitled to little deference.  In her analysis of the

issues, the ALJ fails to adequately support her conclusions with caselaw.  Instead, she applies an arbitrarily high standard which bears little resemblance to the legal standards established by decades of court interpretation of the IDEA.  In addition, the ALJ's legal analysis is largely unreliable because she was factually selective in her analysis and often ignored contradictory evidence.  For instance, when the ALJ determined the District failed to evaluate Student for anxiety, she ignored the fact that Student underwent full psychological evaluations in 2005, 2008, and 2011.  Because the ALJ's opinion is factually selective to the detriment of an accurate factual record and inadequately develops the applicable legal standards, the court affords the ALJ's opinion little deference.

## II.  Denial of Parent Participation

Student alleges that the District denied Parents their right to meaningfully participate in Student's education by: (1) disregarding the Parents' request to exempt student from the OAKS assessment before 2011; (2) failing to provide prior written notices documenting its refusal to provide services; (3) failing to inform Parents about their right to an independent educational evaluation and ignoring the Parents' privately obtained educational evaluations; (4) refusing Parents' requests for reevaluations; and (5) failing to provide Parents with adequate and timely progress reports.

The ALJ held that the District denied Parents the right to meaningful participate during the 2009-2010, 2010-2011, and 2011-2012 academic years by failing to provide Prior Written notice ("PWN") each time the district denied their requests to receive additional services and failing to consider Parent's privately obtained evaluations.  However, the ALJ rejected Student's arguments that the District failed to inform Parents about their right to request an independent evaluation and refused to exempt Student from the OAKS test.

When Congress passed the IDEA, it placed great importance in the role of parents in crafting an adequate and individualized education for each disabled student. *Rowley*, 458 U.S. at 205-06. "Not only will parents fight for what is in their child's best interests, but because they observe their child in a multitude of different situations, they have unique perspective of their child's special needs." *Amanda J. Ex rel. Annette J. V. Clark County Sch Dist.,* 267 F.3d 877, 891 (9th Cir. 2001). The IDEA and its implementing regulations give the parents of a child with a disability the right to participate in shaping their child's education, including: (1) the right to review all student records; (2) the right to participate in all meetings regarding their child's identification, evaluation, and educational placement; (3) the right to an independent educational evaluation; (4) the right to receive prior written notice ("PWN") whenever the district proposes or refuses to initiate a change in the student's educational program; (5) the right to be involved in the educational placement of their child; and (6) the right to a due process hearing before an ALJ if the school district does not meet the standards of the IDEA with respect to their child. 20 U.S.C. § 1415; 34 C.F.R. § 300.501. These procedures "which provide for a meaningful parent participation are particularly important," and signal Congress's "effort to maximize parental involvement" in each child's education. *Amanda J.*, 267 F.3d at 891*, Rowley*, 458 U.S. at 183 n.6.

The primary focus of the parent-participation provisions is to allow a parent to attend and participate in meetings that concern the child's educational program. *See* O.A.R. 581-015-2190. State and federal regulations put the burden on the school district to provide parents with opportunities "to participate in meetings with respect to the identification, evaluation, IEP and educational placement of the child, and the provision of a free appropriate public education to the child." O.A.R. 581-015-2190(1), 34 C.F.R. § 300.322. However, a parent's right to

participate is not boundless.  *See Amanda J.*, 267 F.3d at 895 (although school district violated parents right to participate by failing to disclose test results which indicated a diagnosis of autism, it did not violate the IDEA by failing to allow parents to attend a meeting to determine eligibility for special education because at that time, there was no "specific statutory source for the right to be included" in the eligibility determination meeting.).  A school district need not involve parents in "informal or unscheduled conversations involving school district personnel and conversations on issues such as teaching methodology, lesson plans, or coordination of service provision if those issues are not addressed in the child's IEP."  O.A.R. 581-015-2190(4).  So long as the parent is meaningfully involved in generating the IEP, the District has ultimate control over a student's educational plan.  *See E.Z.-L. ex rel. R.L. v. New York City Dept. of Educ.,* 763 F. Supp. 2d 584, 596 (S.D.N.Y. 2011) ("[W]hile a school district is required to ensure that parents have the opportunity to participate in formulating their child's general educational program, it is not required" to adopt a parent's preferred placement decision.), *See also T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253-54 (2nd Cir. 2009) (So long as District has "an open mind as to the content of" an IEP, a District may formulate pre-meeting recommendations as to a student's ultimate program.).

A.  Refusal to Exempt Student from the OAKS Test

Student argues that, prior to September 2011, the District refused to discuss exempting Student from the OAKS test.  By refusing even to discuss an exemption, Student claims, the District seriously infringed on the Parents' opportunity to participate in the IEP formulation process.  The ALJ concluded that Student failed to establish by a preponderance of the evidence that Parents requested an OAKS exemption prior to September 2011.  According to the ALJ, Mother's "testimony about the issue in the years prior to the 2011-2012 school year was

frequently punctuated by qualifiers like, 'I think' 'I believe', and 'Most likely.'"  (ALJ Op. at 48-49.)

The court agrees with the District.  Despite Student's characterization of Mother's testimony as "unequivocal," Mother does not testify unequivocally that she asked the IEP team to exempt Student from the OAKS test.  When the District asked Mother at the administrative hearing whether she had requested multiple OAKS exemptions, mother responded, "[f]or the most part, yeah.  From what I can remember.  I mean, I know she's got to pass something, so – but she's not going to pass it."  (Tr. at 3461:6-8.)  When Mother was asked whether she requested the exemption for the March 2011 IEP, mother replied "That particular meeting, I don't – I might have.  I don't know.  I know I told them before then in ninth grade, I mentioned it twice.  Once in ninth grade, eighth grade, seventh grade."  (Tr. at 3199:23-3200:1.)

The remainder of the record supports the District's position that Parents failed to request an exemption until 2011.  The May 2009, April 2010, and March 2011 IEPs, which Parents endorsed, all specified that Student would take the OAKS test with accommodations.  The printed portions of the May 2009 IEP, on which the word "exempt" was hand-written and underlined, also indicated Student would take the OAKS test in three of four subjects.  In addition, Ms. Shearer testified that the September 2011 meeting was "[t]he first time [she'd] been aware" of Mother's desire to exempt Student from the OAKS test.  (Tr. at 53:2-14.)  Based on a preponderance of the evidence, the court concludes that Parents did not request an exemption from the OAKS test until September 2011, and the District's failure to exempt Student from the OAKS test did not deny Parents their right to participate.

B.  Failure to Provide Prior Written Notice

Parents next claim they were denied the right to participate when the District failed to

provide Parents with PWN of certain District actions.  In particular, Parents claim they were denied PWN on the following occasions: (1) when the District performed the March 2010 academic evaluation; (2) when the District refused Parents' request for additional speech services in September 2011; and (3) when the District refused Parents' request for a full reevaluation in November 2011.  The ALJ held that, while the District's failure to send a PWN for the March 2010 academic evaluation was de minimis error, Student was prejudiced by the District's failure to give PWN upon refusing Parents' requests for additional speech services and request for a full reevaluation.  The ALJ reasoned that, under the two-step *Rowley* analysis, the District violated the IDEA because its failure to provide PWN constituted a  procedural violation which substantially interfered with Parents' right to participate in Student's education.  The District asks the court to reverse the ALJ, and find that Parents were not denied meaningful participation when the District failed to send the PWN.

The IDEA requires that a school district send written notice to the parents of a disabled child a reasonable time before it:

> (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or
> (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

34 C.F.R. § 300.503(a); *See also* 20 U.S.C. § 1415(b)(3).  The notice must be in understandable language, and must contain:

> (1) A description of the action proposed or refused by the agency;
> (2) An explanation of why the agency proposes or refuses to take the action;
> (3) A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
> (4) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained

(5) Sources for parents to contact to obtain assistance in understanding the provisions of this part;
(6) A description of other options that the IEP Team considered and the reasons why those options were rejected; and
(7) A description of other factors that are relevant to the agency's proposal or refusal.

34 C.F.R. § 300.503(b); 20 U.S.C. § 1415(c)(1).  Failure to send PWN is a procedural violation, and must be remedied only if it "seriously infring[es]" a parent's right to participate.  *See Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012), OR. REV. STAT. § 343.167(3)(b).

### 1. *Before Administering March 2010 Evaluation*

The court agrees with the ALJ that the District's' failure to provide PWN before administering the March 10, 2010, academic evaluation was harmless error that did not seriously deprive Parents an opportunity to participate.  The District took several actions to give Parents actual notice of the 2010 evaluation.  First, the District requested, and parents gave, permission by telephone to administer the March 2010 evaluation.  Second, the District sent a PWN after beginning, but before completing, the evaluation.  The PWN, and other procedural safeguards of the IDEA, are "designed to assure that parents will have meaningful input into decisions that affect the education of children with special needs."  *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 58 (1st Cir. 2002).  The District preserved the Parent's rights to give meaningful input first by seeking permission to administer the evaluation and giving actual notice of its intentions.  The District technically committed procedural error by sending a PWN late, but it did not seriously infringe on the Parents' right to participate in Student's education.

### 2. *Before Increasing Speech and Language Services*

The District requests the court reverse the ALJ's decision that the District violated Parents' right to participate by failing to send a PWN before increasing Student's speech therapy

services to one hour per week in November 2011. The ALJ held with minimal analysis that failure to send "accurate PWN informing the parents of the status of their requests and the status of the District's actions . . . resulted in a loss of the Parents' ability to meaningfully participate . . . ." (ALJ Op. at 49-50.)

At the September 6, 2011, IEP meeting, Parents requested that the District increase Student's speech therapy from thirty minutes per week to two hours per week in school and pay for outside speech services three times per week. The District explained that Student was making progress with the existing speech-therapy regimen, and the District could not increase her speech therapy time without collecting data on Student's present levels. Shortly after the meeting, two members of the IEP team met privately to discuss Parents' request. The District ultimately decided to temporarily increase Student's speech and language therapy to one hour per week to collect present-level data. Eventually, the District agreed to permanently increase Student's speech and language therapy to one hour per week in order to "appease" Parents. The District noted the increase in speech and language therapy in Student's November 2011 IEP, and sent Parents a PWN explaining the increase in therapy time after the November 2011 IEP was finalized.

The District presents two arguments. First, the District argues it was under no obligation to provide PWN because it increased Student's speech and language therapy initially to gather data. Second, District contends that even if it was required to send a PWN, failure to do so was merely a procedural violation which did not seriously infringe on Parents' right to participate. Parents' argue that by failing to abide by the technical requirements of the PWN process, it effectively "cut the Parents out of the decision making process by telling the Parents one thing at a meeting and then meeting again to do the exact opposite of what was decided at the meeting . .

. .ˮ  (Def.-Appellee Student's Response Brief at 13.)

The court concludes that the District did not seriously infringe on Parents' right to participate.  First, although the District admits it failed to provide a prompt and accurate PWN when it originally increased Student's speech therapy, it provided notice to Parents by telephone, discussed the additional speech services at the November 14, 2011 IEP meeting, and noted the increased speech and language time on Student's November 2011 IEP.  (Exs. D36, D37, D41.) Parents had ample notice of the increased services and an opportunity to discuss the change at the November 14, 2011 meeting.

Second, a parent's right to participate is not equivalent to the right to have all his or her requests adopted by the IEP team, because the District makes the ultimate decision regarding the extent of services its students require.  *See Target Range*, 960 F.2d at 1482 ("the statute places the responsibility for the IEP process in the hands of the state and local educational agencies."), *see also, Lachman v. Illinois St. Bd. Of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988) (holding that parents do not have the right to compel a school district to adopt a particular educational program.)  The District honored Mother's right to participate by providing her an opportunity to request additional services at the November 3, 2011, meeting.  The District did not retroactively interfere with Parents' rights when it struck a compromise and provided more speech and language therapy than District personnel thought educationally necessary.  Additional support for the District's argument can be found in the very fact that it decided to increase Student's speech and language therapy beyond what it was originally inclined to.  Had Parents not exercised their right to participate in the November 3, 2011 IEP meeting, the District might not have increased Student's therapy.  Thus, the court concludes that the District did not violate the IDEA by failing to send PWN of its temporary increase to Student's speech and language

therapy in November 2011.

### 3. Before Administering an Occupational Therapy Evaluation

District also asks the court to reverse the ALJ's finding that failure to send PWN to Parents before administering an occupational therapy evaluation denied Parents the right to participate in Student's education. At the October 3, 2011 meeting, Mother noted that Student had difficulty with manual dexterity tasks at home and requested the District provide Student occupational therapy. The District initially denied Mother's request, but after the meeting, reconsidered its decision and directed its occupational therapist to go ahead with an evaluation. The District fulfilled its obligation to allow parental participation by inviting Mother to the meeting and considering her request but had no obligation to grant Mother's request. That the District eventually changed its mind and granted Mother's request to administer the evaluation did not retroactively deny Mother's right of parental participation. Thus, the court concludes the ALJ erred in finding the District violated the IDEA for failing to send prior written notice of its decisions.

### C. Independent Evaluations

Student claims the District also denied Parents the right to participate when it failed to inform Parents of their right to obtain an independent educational evaluation ("IEE") and refused to consider Student's privately obtained IEEs. The ALJ concluded Parents failed to prove by a preponderance of the evidence that the District failed to explain Parents' right to an independent evaluation. In addition, the ALJ determined that the record supported the District's assertion that it considered Dr. Buckendorf's evaluation at the March 2011 IEP meeting, but found that the District denied Parents the right to participate by failing to discuss or consider reports submitted by Student's private doctors, Dr. Ensroth and Dr. Buckendorf, at the November 2011 meeting.

### 1. Explanation of right to an IEE

Parents of a disabled child have "the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the school district." O.A.R. 581-015-2305.  If a parent requests an independent evaluation, the school district must either provide the evaluation at its own expense or initiate a due process hearing to show that a second evaluation is inappropriate.  *See Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1123 (9th Cir. 2003), *superceded on other grounds by* 20 U.S.C. § 1414(d)(1)(B).  Parents claim the District denied them the right to participate by failing to inform them of their right to an IEE at public expense.  However, the record does not support Student's position.  Parents received multiple copies of the District's "procedural safeguards brochure," which outlines the Parents' right to request an IEE.  (Exs. D13 at 1, D25 at 1, D37 at 2.)  Student does not deny that Parents received this brochure, or argue that the brochure itself was insufficient notice.  Thus, the court concludes that the District met its burden of explaining Parents' right to seek an independent evaluation at public expense.

### 2. Consideration of Parents' privately obtained IEE

The ALJ found that the District properly considered the Buckendorf evaluation at the March 2011 meeting, but failed to consider the Ensroth Report and the updated Buckendorf Report at the November 2011 IEP meeting.  Parents challenge the former finding, while the District challenges the latter.  The IDEA requires a school district to "consider the recommendations of persons 'knowledgeable' about'" a student when making decisions about the Student's educational program.  *Target Range*, 960 F.2d at 1485.  "Knowledgeable" persons include the student's teachers, as well as parents and doctors — particularly if the doctor has administered an IEE.  *Id.*  When making decisions regarding the provision of a FAPE, the school

district must consider any and all evaluations obtained at public or private expense.  O.A.R. 581-015-2305(7)(a).  *See also Taylor by Holbrook v. Bd. of Educ.*, 649 F. Supp. 1253, 1256-58 (N.D.N.Y. 1986) (Because the school district failed to consider recommendations of persons "most knowledgeable" about the child, including teachers and doctors, the IEP was not tailored to meet student's unique needs.).

At the administrative hearing, Student's speech therapist, Nancy Hemry ("Hemry") testified at length about the Buckendorf Report.  She testified that she relied on the Buckendorf assessment to develop Student's March 2011 present levels and address Student's communication problems diagnosed by Dr. Buckendorf.  Hemry even consulted with Buckendorf while developing the specifics of Student's IEP.  (Tr. at 2168:18-2176:7.)  Student offers no evidence to rebut Hemry's testimony.  The District was under an obligation only to consider the report, and Hemry's testimony proves the District met its burden to do so.

However, the record does not support the District's claim that it fulfilled its duties to consider the updated Ensroth and Buckendorf reports for the November 2011 IEP.  The District concedes that it did not consider the reports in creating the November 2011 IEP, but argues that it was relieved of the duty to consider them because Parents did not supply the reports in a timely manner.  "The conduct of both parties must be reviewed to determine whether relief is appropriate."  *Target Range*, 960 F.2d at 1486.  However, "the statute places the responsibility for the IEP process in the hands of the state and local education agencies."  *Id*.  Parents emailed the two reports, which together are six pages in length, to the District's special education coordinator on November 9, 2011, five days prior to the November 14, 2011, IEP meeting.  However, the reports were short, and District personnel had ample time to review them prior to the November 14, 2011 IEP meeting.  Late notice of the reports did not excuse the District from

complying with the IDEA.  Thus, the court affirms the ALJ's decision finding the District in violation fo the IDEA for failing to consider the updated Ensroth and Buckendorf reports when drafting the November 2011 IEP.

D.  Failure to Provide Adequate Progress Reports

Student argues that the District denied Parents their right to participate by failing to send adequate and timely progress notes.  When the District sent progress notes, Student claims, they "contained no information linked or related to the Student's IEP[,] AGs[,] and STOs to inform the Parents of Student's progress."  The ALJ found that the district's failure to promptly deliver progress notes contributed to the substantive denial of FAPE between 2009 and 2012.  However, the IDEA does not require a District to deliver progress notes, and the court is not persuaded that timely progress reports are required to create an IEP that is "reasonably calculated to enable the child to receive educational benefits."  This issue, therefore, is more appropriately categorized as a denial of Parents' right to participate rather than a denial of Student's right to a FAPE.

Student cites no authority in support of its position that the parents of a disabled child have a right under the IDEA to progress notes, and the court finds on this record that the District's untimely delivery of Student's progress notes did not seriously infringe on Parents' right to participate.  Parents were regularly in contact with teachers and administrators through meetings, phone calls, and emails.  Parents had ample opportunity to seek updates on Student's progress.  Further, there is no evidence that Parents requested progress notes until the November IEP.  Because Parents had many opportunities to seek updates on Student's educational progress, the District did not seriously infringe on Parent's right to participate by providing the progress reports.

III.  The District's Failure to Identify and Evaluate Student's Disabilities.

Both the District and Student urge the court to reverse portions of the ALJ's decision on "Issues 2 and 3" – the District's identification, evaluation, and reevaluation duties. The ALJ found that although the District did not violate the IDEA by refusing to evaluate student for IQ, communication skills, social skills, motor skills, sensory needs, and assistive technology needs, the District violated the IDEA by refusing to evaluate Student for anxiety and transition needs in the 2009-2010, 2010-2011, and 2011-2012 school years.

"A child must be tested in all areas of suspected disability." *N.B. and C.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008), 20 U.S.C. § 1414(b). School districts are under an obligation to reevaluate a student for educational needs if the district "determines that the educational or related services needs, including improved academic achievement and functional performance" warrant reevaluation, or "if the child's parents or teacher request a reevaluation." 20 U.S.C. § 1414(a)(2)(A); 34 C.F.R. § 300.303. School Districts are required by the IDEA to evaluate disabled students at least once every three years, but not more than once per year. 20 U.S.C. § 1414(a)(2)(B). Courts have made clear the importance of evaluations to the special education process. As one court noted, failing to gather data about a student's disabilities and levels of "renders the accomplishment of the IDEA's goals – and the achievement of a FAPE – impossible." *Hellgate Elementary Sch. Dist.,* 541 F.3d at 1210 (*quoting Amanda J.,* 267 F.3d at 894). When evaluating or reevaluating a student, the district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," and "not use any single measure or assessment as the sole criterion for determining . . . an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(A)-(B).

In the Ninth Circuit, the sufficiency of a school district's actions, including evaluation

decisions and decisions regarding the student's substantive educational curriculum are judged by the "snapshot rule." *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). Under the "snapshot rule," the court analyzes whether the school district's decision or action was reasonable considering the facts and circumstances known at the time the decision was made. It is inappropriate for courts to consider the adequacy or inadequacy of school district action in hindsight. *Id.*

A. Child Find Duties

Parents claim that when the District found Student eligible for special education services on the basis of ASD, it violated the District's "child find" duties under the IDEA. Parents argue that diagnosing Student with ASD, instead of an emotional disturbance ("ED") or communication disorder ("CD") resulted in an inadequate educational program and a denial of FAPE. The ALJ ruled for the District and held that the issue was more appropriately categorized as a failure to reevaluate than a violation of "child find" duties.

Under the IDEA's "child find" duties, educational agencies are responsible for identifying, locating, and evaluating all "children with disabilities . . . regardless of the severity of their disabilities." 20 U.S.C. § 1412(a)(3). Once the school district determines a student is disabled, he or she qualifies for special education and related services. *See Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1496 (9th Cir. 1996). Thereafter, the district must address each of the student's unique needs, whether or not each particular need derives from the qualifying disability. O.A.R. 581-015-2110(4)(c).

The record indicates that the District fulfilled all of its child find duties. In the fall of 2005, the District issued Student's "Evaluation Report" and "Psychoeducational Evaluation and Record Review" ("Psychoeducational Evaluation"). (Ex. S3 at 1.) The Psychoeducational

Evaluation indicated that Student was eligible for special education and related services pursuant to a diagnosis of ADHD.  Later, Student became eligible for services under a diagnosis of ADS, other health impairment, and mild intellectual disability.  Because District promptly evaluated Student in areas of suspected disability and determined she qualified for special education services, it fulfilled its "child find" duties under section.  Whether the District addressed each of Student's unique needs is another issue which the court addresses next.  Therefore, the court agrees with the ALJ's conclusion that the District fulfilled its IDEA "child find" duties.

B.  Evaluating Student's Anxiety

The ALJ determined that the District failed to evaluate Student for anxiety problems in violation fo the IDEA.  The ALJ concluded that the District had significant reliable information that Student had  "clinically significant levels of anxiety," but did nothing.  Thus, failure to address Student's anxiety deprived her of a FAPE.  The court disagrees.

When Student was evaluated in 2005, she became eligible for special education services under disabilities of OHI and ADHD.  At this point, the District had an obligation to meet all of Student's unique needs in order to provide a FAPE.  When Parents, teachers, and doctors later expressed concern over Student's anxious behavior, a duty arose to evaluate Student for anxiety – an area of suspected disability.  However, the ALJ was incorrect to conclude that the District failed to meet its duty.  The District administered the first psychological evaluation in May 2008.  The May 2008 psychological evaluation included a BASC-2 behavioral assessment and Conners assessment.  During the BASC-2 survey, Student's teachers reported that Student exhibited "clinically significant" levels of anxiety, and Mother reported that Student had "at risk" levels of anxiety.  (Ex. S12 at 3.)   The District conducted a second psychological evaluation in March 2011, when Dr. Morris administered the BASC-2 and Conners 3 behavioral tests.  Again,

teachers reported that student had "clinically significant" levels of anxiety,

Because the District gave student two psychological evaluations between 2008 and 2011, both of which measured Student's anxiety, it fulfilled its duty to evaluate Student for anxiety. Whether the District properly served Student's unique needs by addressing her anxiety in a manner that allowed Student to receive educational benefits is a separate issue which the court will address *infra*.

C.  Transition Services

The ALJ also found that in the 09-10, 10-11, and 11-12 school years, the District failed to evaluate Student's transition needs.  Under the IDEA and its implementing regulations, Districts are required to include a transition plan in the IEP that is in effect when a student turns 16.  OAR 581-015-2200(2).  "Transition services" are "a coordinated set of activities for a student with a disability that . . . is focused on improving the academic and functional achievement of the student to facilitate the student's movement from school to post school activities . . . ."  O.A.R. 581-015-2000(39).  These services are based on the student's unique needs and are aimed at stimulating the student's interest in preparing for life after school.  *Id*.  School districts have an obligation to base a Student's transition plan on "age appropriate transition assessments . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).

Questions exist regarding whether the District provided Student adequate transition services.  However, the District's duty to provide transition services does not fall within its evaluation and reevaluation obligations. The IDEA requires that school districts evaluate students "in all areas of *suspected disability*."  *Hellgate Elementary Sch. Dist.,* 541 F.3d at 1208 (emphasis added).  Although students with disabilities have a heightened need for transition services, a need for transition services is not itself a disability.  Thus, categorizing the District's

responsibility to base a student's transition plan on age-appropriate assessments as part of its evaluation and reevaluation duties unreasonably distorts the statutory language. Failure to assess a student's transition needs does not violate the IDEA's requirement that a school district evaluate students for suspected disabilities. Instead, it is more accurately characterized as a failure to follow IEP procedure, and possibly a substantive denial of FAPE. Accordingly, the court will address whether the district adequately evaluated Student's transition needs when it addresses Student's substantive FAPE.

> D.  Other evaluations

The ALJ held that the District was not in violation of the IDEA for failure to evaluate Student in the areas of IQ, communication skills, social skills, motor skills, sensory needs, and assistive technology needs. Parents argue that the ALJ erred, and argue that the District had enough evidence to trigger their reevaluation duty. However, Parents fail to cite any evidence on the record in either their opening brief or reply brief to support this argument. Parents merely recite the requirements of Oregon regulations with respect to reevaluations and claim that evidence supporting their position exists. Parents have failed to demonstrate that the ALJ erred, and the court affirms her decision on this issue.

## IV.  Denial of a Free Appropriate Public Education

The ALJ determined that the April 2010, March 2011, and November 2011 IEPs failed to provide Student a free adequate public education. However, the ALJ held that Student failed to present sufficient evidence "about what services and teaching methods the District employed . . . to make a determination that" the May 2009 IEP denied her a FAPE. The ALJ made clear that all four IEPs suffered from one or more of the following flaws: (1) "Student was treated generically" by the IEP, such that it did not address her unique educational needs; (2) the IEP did

not provide transition services as required by the IDEA; and/or (3) the IEP "does not appropriately address Student's "troubling anxious behavior.  Further, Student argues the District violated the IDEA by requiring Student to take the OAKS test in the time period covered by the May 2009 IEP.  The court will address each alleged deficiency in turn.  The District contends that each IEP provided Student a FAPE, and asks the court to reverse the ALJ's conclusions with respect to the April 2010, March 2011, and November 2011 IEPs.

The IDEA aims to provide disabled students with a free appropriate public education ("FAPE").  A FAPE is "special education and related services" that –

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  The individualized education plan ("IEP") is the primary mechanism school districts use to provide FAPE.  An IEP is a written report unique to each disabled child that contains the following: (1) The child's "present levels of academic achievement and functional performance;" (2) A statement of measurable annual academic and functional goals; (3) a description of "how the child's progress toward meeting the annual goals . . . be measured"; (4) A statement of the services and program modifications that the school will provide for the child; (5) a description of the extent "to which the child will not participate with nondisabled children in the regular class"; (6) a statement of the accommodations and modifications necessary to measure the child's performance "on State and districtwide assessments"; (7) the projected beginning date and duration of the services and modifications.  20 U.S.C. § 1414; 34 C.F.R. § 300.320.

The IEP is developed by a team (the "IEP Team") consisting of the child's parents, regular education teachers, special education teachers, a representative of the district, and "other individuals who have knowledge and expertise regarding the child."   20 U.S.C. § 1414(c).  To determine the substance of the educational program, the IEP Team must consider:

> (1) the strengths of the child;
> (2) the concerns of the parents for enhancing the education of their child;
> (3) the results of the initial evaluation or most recent evaluation of the child; and
> (4) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(3)(A). The IDEA also requires the IEP Team consider special factors for children with behavioral problems and communication problems.  20 U.S.C. § 1414(d)(3)(B). When a child has behavior issues that impede his or her learning, the IEP Team must consider "the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  *Id*.  Further, the IEP Team must address the child's communication needs, and consider whether assistive technology would help ameliorate any of the child's educational or functional difficulties.  *Id*.

An IEP complies with the IDEA if it outlines an educational program "reasonably calculated to enable the child to receive educational benefits."  *Rowley,* 458 U.S. at 206-07.  An IEP need not guarantee a particular result, or even "maximize the potential of handicapped children commensurate with the opportunity provided to other children"  *Id*. at 189-190.  A student's educational program outlined in the IEP provides a FAPE if it "(1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities," and (3) "comport[s] with the goals and objectives on the student's individualized education program."  *Capistrano*, 59 F.3d at 889, 89.  Like other school district action, the court analyzes the substantive sufficiency of an IEP according to the "snapshot rule."

*J.W. ex rel J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 421, 439 (9th Cir. 2010).  According to this formulation, an IEP provides a FAPE if it complies with IDEA procedures and was reasonably calculated to provide educational benefit given the student's disabilities as they were understood at the time.  *Id.*

 A.  Generic Treatment

 The ALJ's primary concern with the April 2010, March 2011, and November 2011 IEPs was that they treated student generically in three ways.  First, they "contain[ed] little to no information that would allow a team member to adequately determine how Student's disabilities and deficits affected his/her ability" to learn, and does not explain "why or how the child was learning" the particular subjects in her educational curriculum.  (ALJ Op. at 58.)  Second, while the IEPs contained annual goals ("AGs") and short-term objectives ("STOs"), it was "unclear why those goals were chosen and not others," and "it was unclear from the document[s] whether they were uniquely tailored to Student's disability and his/her needs." (ALJ Op. At 58.)  Third, the ALJ held that the IEPs were generic because they failed to require all of Student's teachers to adopt the teaching methods employed by Student's writing workshop teacher, Eric Larsen ("Larsen").  The court disagrees with all three aspects of the ALJ's reasoning.

 *1.  Present Levels, Annual Goals, and Short-Term Objectives*

 Each IEP must contain a "statement of the child's present levels of academic achievement and functional performance" as well as a statement of "measurable annual goals." 34 C.F.R. § 300.320(a)(1).  The present levels must include a description of "how the child's disability affects the child's involvement and progress in the general education curriculum . . . ." 34 C.F.R. § 300.320(a)(1)(i).  The annual goals must be unique to each child, and must address disability-related needs which affect the child's ability to receive educational benefit.  Finally,

the IEP must contain a description of "[h]ow the child's progress toward meeting the annual goals . . . will be measured . . . ." 32 C.F.R. § 300.320(a)(3)(I).

The court disagrees for several reasons that the AGs and STOs were. First, the record does not demonstrate that the April 2010, March 2011, and November 2011 treat Student generically. The present level statements break down Student's academic strengths and weaknesses and explain in detail what Student is learning in each subject. Most of the sections even contain some objective measure of Student's progress in that subject. For example, the "Self-Management" section in the April 2010 IEP notes that "[w]hen given directions, [Student] will verbally restate directions to the teacher when asked on 7/10 opportunities." (Ex. D12 at 8.) It continues, "[d]uring a class, [Student] will ask for help on average of 12 times per class (especially when given an assignment to complete independently) . . . ." (Ex. D12 at 8.) The present level statements clearly relate to Student's Self-Management annual goal that she "increase her independence and confidence in classroom routines by meeting" her short term objectives. Further, the court could find no support for the ALJ's contention that the IDEA requires a present level statement to explain in detail why or how the child was learning the subject matter described in her present levels.

Further, the ALJ is incorrect that the present level statements make it difficult or impossible for the reader to determine how Student's disability affects her involvement and access to the educational curriculum. The April 2010 IEP present level statement explains that Student's disability "affects how she processes language and new information, and significant levels of assistance and instruction are needed to provide access to the curriculum." It goes on to explain that Student's cognitive problems have hindered her reading and writing abilities. The March 2011 and November 2011 IEPs explain the following:

> How the student's disability affects her involvement and progress in the general education curriculum: Due to [Student]'s need for specially designed instruction in reading, writing, and math, as well as support to complete work and study for other classes, [Student] is enrolled in the special education classes: Basic English; Basic Math 2; Reading Language Lab; and Tutorial.
>
> Due to challenges that [Student] has processing auditory information; it is very helpful for information presented in all classes be [sic] as visual as possible.  Breaking down large assignments into smaller steps with due dates for each step written on a calendar is also helpful.
>
> To help [Student] better understand reading materials in all classes, it is best to check for understanding often through a sequence of simple comprehension questions.  Waiting until the end of a section of reading to check for understanding is too long.

(Ex. D24 at 6.)

Although not particularly detailed, the AGs and STOs are uniquely designed to address Student's difficulties with the general education curriculum as required by the IDEA.  Student's language AGs and STOs are aimed at addressing Student's communication difficulties, in particular Student's "struggle[s] in the area of language, specifically organizing her language thought process . . . ."  (Ex. D12 at 10, 8.)  Student's AGs and STOs for reading, writing, and self-management are similarly specialized for Student's unique difficulties in those subjects.

The AGs and STOs for all three IEPs at issue are also consistent with the requirements of the IDEA because they are measurable.  Student's expert, Moore, testified before the ALJ that the April 2010 reading, writing, and mathematics AGs and STOs are measurable.  Moore testified that the primary defect in most of the AGs and STOs were that they were "once and done"; that is, Student could complete a particular task once and fulfil her AG for a particular year.  However, the IDEA requires only that AGs and STOs be "measurable."  As Moore testified, all four IEPs meet that standard, and the IDEA requires no more

### 2. Teaching Techniques

The ALJ next took issue with the District's refusal to adopt a particular method of teaching in all of Student's classes. Eric Larsen, Student's English and Writing teacher, determined Student learned most effectively when he taught using constant repetition of small pieces of information, followed by immediate analysis and application. Although the District did not require all of Student's teachers to adopt this strategy, it did note in her IEPs that "it is best to check for understanding often through a sequence of simple comprehension questions. Waiting until the end of a section of reading to check for understanding is too long." The ALJ determined this was insufficient, and concluded that "[t]he District cannot meet its legal obligation to Student by ignoring known teaching techniques that would allow Student the ability to make progress . . . ." (ALJ Op. at 59.) The District contends that requiring that all Student's teachers adopt one teaching technique is unreasonable, and would be unworkable in both general and special education classes.

The IDEA requires that a school district adopt an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 206-07. Courts have repeatedly held that an IEP need not maximize a student's educational benefit. *Id.* Further, the school district is the final arbiter of the educational program. As one court noted, "parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Lachman v. Illinois St. Bd. Of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988). The court can find no authority for the ALJ's conclusion that a school district may be required to teach each special education student with teaching methods which work best for that student. As the Supreme Court held in *Rowley*, it is not the prerogative of outside actors to usurp the authority of school districts by substituting their own ideas about sound educational policy

for that of the schools. *Rowley,* 458 U.S. at 206. Further, requiring a school district to educate a student using only those methods which work best for the student contradicts Ninth Circuit cases which explain that "the instruction provided need not be the 'absolute[] best or potential maximizing.'" *Amanda J.*, 267 F.3d at 890. A court or administrative law judge ordering all of the teachers who teach a particular student to adopt a certain teaching methodology does just that.

On a practical level, requiring all of Student's teachers to adopt the "Larsen method" when teaching student would work a detriment both to Student as well as Student's classmates. In general education classes, students without special needs would be taught using a teaching pace and method specialized for a student with an intellectual disability. The amount of material covered over a semester would be significantly lower, and Student's non-disabled classmates would be forced to learn at the pace of a special education student. This would discourage the District and other schools from "mainstreaming" students, which the IDEA encourages. Conversely, in Student's special education classes, the policy ordered by the ALJ would work to the detriment both of Student and Student's classmates. If, as the ALJ concluded, the IDEA requires special education students to be taught using the methodology which works best, then a special education teacher must teach the same substantive material repeatedly using different teaching methodologies depending on how each student in her class works best. This would undoubtedly lead to students learning less substantive material and would likely result in a significant amount of idle time during class while other students were learning according to "their" teaching methods. Finally, mandating specific teaching methods would strip schools of the flexibility to experiment with other teaching strategies, some of which may work better than those presently adopted. Overall, both the IDEA and concepts of educational practicality

suggest the ALJ erred in requiring the District to adopt the "Larsen method" in all of Student's classes.

### 3. Other Evidence of Non-Generic Treatment

Other parts of Student's IEPs provide additional support for the court's conclusion that her IEPs are uniquely tailored to meet Student's needs. Each IEP provides between thirty and sixty minutes per week of speech and language therapy to address Student's problems "in the area of conversational language . . . includ[ing] turn tak[ing] and holding the attention of her listener . . . ." The District would not have provided speech and language therapy unless Student demonstrated a unique need for it. Further, each IEP requires Student's teachers to modify Student's curriculum or accommodate Student's unique disabilities. The March 2011 IEP provides that Student will receive the following accommodations and curriculum modifications: (1) visual supports for homework and class work; (2) modified tests and assignments to accommodate Student's reading difficulties and test anxiety; (3) alternate test locations for completing tests and assignments; (4) copies of the teacher's lecture notes to accommodate Student's trouble staying on task and paying attention during lecture; (5) extended time to complete tests and assignments to reduce Student's anxiety and accommodate her reading problems; (6) a voice recorder to record lectures; and (7) second row seating in all classes to promote Student's self-management skills and on-task behavior.

In summary, the services, accommodations, and curriculum modifications provided by the District are not generically provided to each special education student in Forest Grove School District. Instead, the District provided them to Student, after a lengthy evaluation process, to help Student access the educational curriculum despite her unique needs. Because the weight of the evidence does not support the ALJ's conclusion that Student's IEPs treated her

generically, the court reverses her decision.

### B. Transition Services

The ALJ concluded the District violated the IDEA by failing to provide Student with adequate transition services in the April 2010, March 2011, and November 2011 IEPs. The IDEA requires that the IEP in effect when a student turns 16 years old contain a "transition plan" outlining "appropriate measurable post-secondary goals based upon age appropriate transition assessments" and "transition services . . . needed to assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); 34 C.F.R. § 300.320 (b). "Transition services" are a set of services intended to prepare disabled students for life after high school, and should be:

> designed to be within a result-oriented process, that is focused on improving academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation.

20 U.S.C. § 1401(34)(A). In addition, transition services should be focused on catering to the student's "strengths, preferences, and interests." 20 U.S.C. § 1401(34)(b). *Id*. The "transition plan" must include "appropriate measurable postsecondary goals . . . related to training, education, employment, and, where appropriate, independent living skills." It must outline the course of study and other services "needed to assist the child in reaching those goals." *Id*.

Section 1414(d) imposes three distinct duties on school districts with respect to transition services. First, a school district must conduct "age appropriate transition assessments related to training, education, employment, and . . . independent living skills." Second, the district must draft a transition plan, including "appropriate measurable postsecondary goals . . . ." Third, a school district must actually provide transition services reasonably calculated to aid student in achieving those goals.

When Congress heightened the IDEA's transition services requirements, it made clear in the legislative history that transition services were of great importance. *Carrie I. ex rel. Greg I. v. Dept. of Educ., Hawaii*, 869 F. Supp. 2d 1225, 1244 (D. Haw. 2012). "As the graduation rates for children with disabilities continue to climb, providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities." 20 U.S.C. § 1400(c)(14). Transition services, Congress concluded, are an essential tool which prepare "special education students to leave [high school] ready to be full productive citizens, whether they choose to go on to college or a job." 150 Cong. Rec. S11653–01, S11656 (Nov. 19, 2004) (Conf. Rep. accompanying H.R. 1350) (Statement of Sen. Dodd).

Few cases in the Ninth Circuit squarely address the threshold for an adequate transition plan. However, *Browell v. Lemahieu*, 127 F. Supp. 2d 1117, 1125 (D. Haw. 2000), is instructive. There, an eighteen-year-old student challenged the sufficiency of his IEP's transition plan when the plan included "goals for the completion of high school, becoming part of his larger community through a church group, finding out about careers that would suit and interest him, exploring local community colleges, and speaking with vocational counselors." *Id*. In addition, district personnel gave the student a career test; took him to visit two community colleges; and provided him with information about how to get ready for college, how to enroll in college, and what courses he should take. *Id*. The court held that the goals and services provided by the district were reasonably calculated to provide the plaintiff with educational benefit, in part, because the plaintiff made progress toward, or fully achieved, all of his measurable postsecondary goals. *Id*. at 1126.

    *1. April 2010 IEP*

The April 2010 IEP was in effect when Student turned sixteen and should have contained a transition plan. The April 2010 IEP, though, made no reference to a transition plan, transition services, or transition assessments. In fact, the District's transition specialist did not meet with Student or Parents until March 2011 in preparation for the March 2011 IEP. (Tr. 2684:12-15.) By neglecting its duties to student regarding transition services between April 2010 and March 2011, the District violated the IDEA.

The District argues that it nonetheless complied with the IDEA because it began administering transition services in March 2011, six weeks after Student's sixteenth birthday. Given that the IDEA allows for educational services until a Student's twenty-first birthday, the District contends, the six-week delay in transition services was not prejudicial to Student. However, this argument ignores that the IDEA expressly commands school districts to include a transition plan in the IEP in effect when the student turns sixteen. The IDEA also provides that the School district may draft a transition plan even earlier if it would benefit the student. Further, the court can find no evidence that the district administered any age-appropriate transition assessments prior to the April 2010 IEP. Therefore, the court finds the District violated the procedural requirements of the IDEA by failing to include transition services between April 2010 and March 2011.

### 2. March 2011 IEP

The ALJ concluded that the March 2011 IEP also contained a deficient transition plan in violation of the IDEA. She concluded that, given Student's "multiple deficits," the transition assessments were insufficient to craft a transition plan that would fit Student's needs. (ALJ Op. at 60.) The ALJ also found the services articulated in the plan substantively insufficient. She reasoned that,

Student is currently reading at a 2nd to 4th grade level. The transition plan states that Student will access transition services during his/her senior year. That statement is inappropriate in this case where Student learns slowly, needs to be given small amounts of information at a time, and needs frequent repetition to retain information.

(ALJ Op. at 60.)

The court agrees with the ALJ that the March 2011 transition plan is completely defective. The March 2011 transition plan articulates two distinct post-secondary goals. First, that Student attend community college on a part-time basis, and second, that she access the community by driving. These are reasonable post-secondary goals for a high-school student working toward a modified diploma. Thus, the transition plan itself complies with the IDEA.

The March 2011 transition plan also provides transition services to allow Student to achieve her transition goals. The transition plan lays out a course of study "related to her post-secondary goal[s]" and provides that Student "will participate in the work experience program . . . [and] the community living program in order to aid her in learning daily living skills . . . ." (Ex. D24 at 8.) The ALJ found unacceptable the District's delay in providing extracurricular transition services such as the community living program and work experience program. However, the ALJ wrongly concluded that all transition services were delayed until Student's senior year. The IDEA requires school districts to provide "transition services (including courses of study) needed to assist the child" in reaching his or her transition goals. Thus, Student's classes which facilitate Student's achievement of post-secondary goals are themselves transition services. Student's educational curriculum focuses primarily on functional skills Student needs for life after high school. For instance, Student's math class is focused on word problems, basic algebraic equations, and telling time; her reading class prepared Student for post-high-school living by improving her inferential reading and reading comprehension skills; and in her culinary arts class, Student learned to cook, which is unquestionably an invaluable

skill for independent living.

However, the ALJ correctly concluded that the District failed to base the transition plan on age-appropriate transition assessments. The only assessment the District conducted before finalizing the March 2011 IEP was a brief discussion between Student and a member of the IEP team about Student's "interests in employment, living arrangements, and transportation." (Def.'s Reply Br. at 16.) Unlike the career interest surveys which the District administered in December 2011, the March 2011 discussion was not a formalized assessment which would allow the District to facilitate Student's exploration of career paths. Therefore, the March 2011 transition plan violated the IDEA.

### 3. November 2011 IEP

The ALJ reasoned that because the November 2011 IEP is "almost identical to the March 2011 IEP transition plan, this plan is defective for the same reasons." (ALJ Op. at 62.) The court agrees that the IEPs are similar enough to compel a similar analysis, but disagrees with the ALJ's ultimate conclusion that the plan was wholly deficient. Instead, the court concludes that the November 2011 transition plan contained adequate post-secondary goals and provided transition services to achieve those goals but was not based on age-appropriate assessments as required by the IDEA.

Like the March 2011 IEP, the November 2011 transition plan adequately addresses Student's transition needs. If anything, the November 2011 IEP contains a more detailed description of post-secondary goals and transition services. The November 2011 present levels note that Student "shared that she would like to work at either Holister or American Eagle after high school, live with family in Arizona, and get her driver's license." (Ex. D36 at 8.) Further, unlike the March 2011 transition plan, the November 2011 transition plan indicates that Student

"is currently completing a program of study working with sheep which [the Future Farmers of America] has approved."

The November 2011 IEP also provides an adequate program of transition services. Student's course work in the 2011-2012 school year was again focused on preparing Student for life after high school. Her reading and math classes focused on skills Student would need on a daily basis when living more independently. In her functional math class, Student was learning "open ended story problems that deal with money" and "terms such as deposit, withdrawal, and . . . [how] to perform the correct math calculation to balance an account . . . ." (Ex. D36 at 14.) The November 2011 transition plan, therefore, complies with two of three IDEA requirements. Further, Student's participation with Future Farmers of America bolstered her interest in a career involving animals and agriculture.

However, like the March 2011 IEP, the November 2011 plan was not based on age-appropriate transition assessments. Student completed the ACT career interest survey in April 2011 and discussed "possible employment opportunities" with her speech pathologist before the IEP team met in September and November 2011, but there is no evidence the District considered the results of these assessments while drafting Student's November 2011 transition plan. While the November 2011 IEP was in effect, the District's transition specialist interviewed Student and administered a formal career interest survey, but not until after Student filed her request for a due process hearing. (Ex. D50 at 20-21.) Despite the District's efforts to remedy their failure after the fact, the November 2011 transition plan was not based on age-appropriate transition assessments, and procedurally violated the IDEA.

C.  Treating Student's Anxiety

The ALJ next concluded that the District inadequately addressed Student's "troubling

anxious behavior at school . . . " in all four IEPs.  (ALJ Op. at 59.)  "These behaviors impeded Student's learning and the learning of others at school and should have been considered by the IEP team in developing interventions, strategies, and supports." (ALJ Op. at 57.)  The District contends that it implemented a combination of accommodations, modifications, and self-management instruction uniquely designed to reduce Student's anxiety, and requests the court reverse the ALJ's decision.

The IDEA requires that "in the case of a child whose behavior impedes the child's learning. . . [the IEP team must] consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).  The bar on implementing behavioral strategies is not high.  *M.M. v. Dist. 0001 Lancaster County Sch.,* 702 F.3d 479, 487 (8th Cir. 2012).  "It is 'largely irrelevant' if the school district could have employed 'more positive behavior interventions' as long as it made a 'good faith effort' to help the student achieve the educational goals outlined in his [or her] IEP."  *Id.*

In *Lancaster County School*, a student with severe emotional and behavioral problems alleged that he was denied a FAPE in part due to the District's preferred method of regulating his behavioral problems.  *Id.*  The plaintiff was prone to violent outbursts that often required teachers to physically restrain him.  *Id.*  To prevent injuries to teachers and other students, school district personnel would periodically isolate the plaintiff in a "calming room."  *Id.*  Plaintiff attended a rehabilitation facility after his third-grade year where doctors recommended the district use "physical hold" techniques in lieu of the calming room when the student became violent.  *Id.*  The District considered, but did not adopt, the doctors' recommendation and continued utilizing the calming room when plaintiff became violent.  *Id.*  The court upheld the school district's use of the calming room and overall educational program because district

personnel "believed [the calming room] had helped to reduce his problem behaviors at school," and noticed that when the school used the calming room "it was longer before another behavior occurred." *Id*. Because the district acted in good faith, the court concluded its use of the calming room did not violate the IDEA. *Id*.

The District first argues it had no responsibility to address Student's anxiety because it did not affect her learning or the learning of others. To support its argument, the District cites testimony of Student's teachers, who claimed Student was always happy, cheerful, and jovial in class, and cites the expert testimony that Student's anxiety did not impact her education. (Def.'s Opening Br. at 35, *citing* Tr. 2203:11-2204:8, 3047:11-3047:16, 1215:13, 4333:5-4333:6.)

The court agrees that Student overstates the degree to which her anxiety affects her education, but the balance of the evidence shows that Student exhibited anxious behaviors at school which the school was required to address, but did not. Both Student and the ALJ mention that Student has become physically ill in the past due to her extreme anxiety, but there is no evidence that Student ever exhibited this degree of anxiety in the classroom. Mother testified to three scenarios which gave rise to Student's anxiety. First, she testified that when Student was in elementary school, she became extremely anxious when a classmate was hurt on the playground. (Tr. at 3080:7-13.) Second, Mother described a scene that occurred shortly after Student moved to the District. Mother needed a jump-start for her car, and asked some neighbors if they could help. Student became so anxious, she repeatedly yelled "Don't ask them for a jump" and vomited. (Tr. at 3080:14-24.) Third, Mother testified that Student is extremely afraid of mascots — so afraid that Student's family has left multiple professional sporting events early because a mascot was in Student's vicinity. (Tr. at 3081:4-24.) None of these scenarios occurred during class-time or had an affect on Student's ability to learn.

However, as indicated by Student's teachers on her 2008 and 2011 psychological evaluations, Student exhibited anxious behaviors in the classroom. Student's classroom anxiety did not rise to the level of physical illness or panic attacks, but her anxiety caused her to fixate on making mistakes and reduced her focus on the substantive material. Student often rushed to finish her assignments, erased pages of written work to fix one misspelling or misplaced punctuation mark, and monopolized her teachers' time by asking off-topic questions and repeatedly requesting reassurance. Although Student's in-class anxiety was not so severe as to make her physically ill or incapacitated, it sufficiently affected her learning and the learning of others enough that the IEP should have addressed it.

The District next claims that, even if it had an obligation to address Student's anxiety, it discharged its burden in all four IEPs through a combination of accommodations, modifications, and self-management instruction. The court partially agrees. First, the District provided a number of curriculum modifications and accommodations aimed at reducing Student's anxiety associated with tests and assignments including, (1) verbal responses for testing; (2) a seat close to the teacher in class; (3) extra time for projects and assignments; (4) shortened writing assignments; (5) visual supports to assist Student with comprehension; (6) an opportunity to retake tests to fix incorrect answers; (7) access to a copy of her teachers' lecture notes; (8) alternate location for testing; and (9) a shared instructional assistant to help answer questions. The May 2009 and April 2010 IEPs also contained a "self-management" curriculum designed to encourage Student to be more independent and rely less on her teachers for reassurance. The IEP Team had multiple meetings to discuss Student's anxiety problems, and even created a "script" for student to follow while working independently to reduce her anxiety.

The court's role is not to judge whether these behavioral modification techniques are the

ideal strategy for treating Student's anxiety, but to determine whether the District made a good-faith effort to create an academic plan to minimize Student's anxiety during the time-periods covered by the May 2009 and April 2010 IEPs.  The court concludes the district did so.  During this period, Student achieved passing grades and, between April 2010 and March 2011, maintained a grade-point average of 3.25.  In addition, Student made some progress in her self-management curriculum and began working more independently.  It is clear Student had academic success under the District's anxiety-management regime.  Here, as in *Lancaster County Schools*, there is ample evidence to support the District's contention that the anxiety-management regime in the May 2009 and April 2010 IEP were constructed in good faith.

The March 2011 and November 2011 IEPs, however, do not contain a self-management curriculum.  The self-management present levels, AGs, and STOs targeted Student's inability to work independently, need for constant reassurance, and distractability.  These behaviors result in Student's teachers spending more time with Student answering questions, giving reassurance, and ensuring on-task behavior, an in a reduction of the time Student's teachers can spend with other students in the classroom.  Neither the IEP nor IEP meeting notes explain why the IEP team eliminated the self-management curriculum.  Although evidence exists that Student was making progress toward being more self-reliant and independent, the record does not indicate that she became independent enough to wholly eliminate the self-management curriculum from the IEP.  In fact, just days before the IEP team finalized Student's March 2011 IEP, Amanda Morris released the 2011 psychological report which showed clinically significant levels of anxiety.  Given that Student's anxiety was a continuing problem between March 2011 and December 2011, elimination of the self-management plan left Student's teachers with little to no guidance on how to properly interact with Student in a way that bolstered Student's

independence and reduced her anxiety. The record contains insufficient evidence that the District eliminated the self-management curriculum in good faith, and concludes that the District failed to adequately address Student's anxiety issues in the March 2011 and November 2011 IEPs.

### D.  Substantive Denial of FAPE

The ALJ concluded that only the May 2009 IEP provided a substantive free appropriate public education. The District argues that the ALJ imposed an artificially high standard during the substantive FAPE analysis, and requests the court reverse the ALJ's decision with respect to the other three IEPs. Student contends that she was denied a FAPE by the May 2009 IEP, and requests the court reverse the ALJ. She also urges the court to find the District denied her a FAPE in all four IEPs with respect to her reading curriculum.

#### 1.  May 2009

The ALJ's conclusion with regard to the May 2009 IEP is ambiguous. She found the May 2009 IEP contained a number of IDEA procedural violations, but concluded:

> It may be the case that Student's needs were not properly met during the 2009-2010 school year time period at issue. But there was simply insufficient evidence presented about what services and teaching methods the District employed for Student to make a determination that a substantive violation occurred. Despite the lack of evidence of a substantive violation, the IEP procedural flaws alone amount to a denial of FAPE.

(ALJ Op. at 57.) The ALJ parsed the concept of FAPE into substantive FAPE and procedural FAPE. Separating FAPE into substantive and procedural elements contradicts *Rowley*, where the court held that procedural errors violate the IDEA only if they deny a Student a substantive FAPE or seriously interfere with parent participation. 458 U.S. at 206-07. Instead, the court's task at this stage is to determine whether, given the totality of the substantive education plan and procedural defects of the IEP, the IEP was reasonably calculated at the time of formation to

provide the student with some educational benefit. *Id*.

As discussed *supra*, the May 2009 IEP treated Student uniquely; stated Student's present levels, AGs, and STOs with adequate specificity; and provided a good-faith effort to address Student's anxiety through accommodations, modifications, and a self-management curriculum. On the whole, the May 2009 IEP addresses all of Student's unique needs and is "reasonably calculated to enable the child to receive educational benefit." To the extent minor procedural flaws exist, they do not rise to the level of denying Student a free appropriate public education.

Student argues the court should reverse the ALJ and find the District denied her a FAPE during the period between May 2009 and April 2010. She argues that the District failed to implement the IEP by requiring her to take the OAKS test despite the hand-written word "exempt" appearing on the May 2009 IEP. The court disagrees that the IEP "clearly indicated that Student was to be exempt from *all* statewide assessments." Although the word "exempt" appears hand written on the "statewide assessment" page of the May 2009 IEP, the type-written and printed portions contradict Student's claim. Below the question "[w]ill the student participate in any Statewide Assessment during this IEP period?" a box next to the word "Yes" is checked. The page also indicates Student will take the reading, mathematics, and writing portions of the OAKS with accommodations. The fact that Mother endorsed the 2009 IEP without seeking or obtaining clarification of the discrepancy between the hand-written and typed portions of the "Statewide Assessment" page suggests that the IEP Team was in agreement that Student should participate in the OAKS test.

2. April 2010

The ALJ found the April 2010 IEP violated the IDEA and denied Student a FAPE. The court agreed with the ALJ that the District's failure to provide transition services violated the

IDEA, but reversed the ALJ on all other grounds. In *J.L. v. Mercer Island Sch. Dist.*, the Ninth Circuit discussed the interaction between transition services and FAPE. 592 F.3d 938, 946-48 (9th Cir. 2010). There, the Ninth Circuit reversed the district court decision which held that, when Congress amended the IDEA in 1990 and 1997, it intended to replace the *Rowley* "educational benefit" standard with a standard focused on whether a student substantively achieved their transition goals. *Id.* at 950. There, the Ninth Circuit disagreed with the district court's conclusion that:

> [t]he IDEA is not simply about "access;" it is focused on "transition services, . . . an *outcome-oriented* process which promotes movement from school to post-school activities . . . taking into account the student's preferences and interests." This is such a significant departure from the previous legislative scheme that any citation to pre-1997 case law on special education is suspect

*Id.* at 949, *quoting J.L. v. Mercer Island Sch. Dist.*, No C06-494P, 2006 WL 3628033, at *4 (W. D. Wash. Dec. 8, 2006). The court of appeals rejected that approach, reasoning:

> First, Congress did not change the definition of a free appropriate public education in any material respect. If Congress desired to change the free appropriate public education standard, the most logical way to do so would have been to amend the free appropriate public education definition itself. Second, Congress did not indicate in its definition of "transition services," or elsewhere, that a disabled student could not receive a free appropriate public education absent the attainment of transition goals.

*Mercer Island*, 592 F.3d at 951. Further, courts around the country have held that school districts are not in violation of the IDEA for failing to include a transition plan in the IEP of a student who was under sixteen. *Dept of Educ., Haw. V. C.B. ex rel. Donna B.*, Civil No. 11-00576 SOM/RLP, 2012 WL 1537454, at *8 (D. Haw. May 1, 2012) ("Not every denial of services constitutes a denial of a FAPE, and no statutory provision requires that a transition plan be included in [this] IEP."); *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) ("The absence of IEP provisions addressing transition and behavior issues does not, standing

alone, violate the IDEA of deprive a disabled child [under sixteen] of a FAPE.")

However, there is no legal support for the contention that an IEP in place when a student turns sixteen years old and which does not contain a transition plan, nonetheless provides a FAPE.  An analysis of the *Rowley* standard supports the court's conclusion that denial of a FAPE necessarily arises when a school district facially violates the IDEA by not providing a transition plan when required to do so.  *Rowley* instructs that the court should find an IEP sufficient if it "enable[s] the child to receive educational benefits."  *Rowley*, 458 U.S. at 177.  Stated alternatively, *Rowley* counsels to ensure a student receives a benefit from their time in an educational institution.  But an education has little or no benefit to the educated if it is not put to use in daily life.  Congress made clear with the 1990 and 1997 amendments to the IDEA that part of an educational benefit, or benefit of an education, is the use to which that education may be put after high school.  Failing to administer a transition plan which prepares a student to benefit from their education after high school denies that student an educational benefit.  Here, the District did just that by failing to include a transition plan in the April 2010 IEP.  Therefore, the court finds the District denied Student a FAPE between April 2010 and March 2011.

### 3.  March 2011 and November 2011 IEPs

The court determined that the March 2011 and November 2011 IEPs contained similar procedural errors: they failed to adequately address Student's anxiety through a self-management curriculum and did not base their transition plan on age-appropriate transition assessments.  Unlike the April 2010 IEP, which wholly omitted a transition plan, the March 2011 and November 2011 IEPs provided a plan, and administered transition services in accordance with that plan.  Thus, Student received the educational benefits of transition services in her transition math and reading classes, as well as her after-school program with the FFA.  The March 2011

and November 2011 IEPs provided Student the ability to learn the skills necessary to transition post-high school and allowed Student to receive academic benefit in the area of transition education.  Because Student functioned at such a low level, she required transition education in very basic topics, such as reading and basic math for managing money, the District's failure to base her transition plan on assessments measuring Student's career interest was harmless.

The District's omission of a self-management curriculum, however, was not harmless error.  As discussed *supra*, the self-management plan was essential to curbing Student's anxiety. By excluding the self-management present levels, AGs, and STOs from the March 2011 and November 2011 IEPs, Student's teachers would not know to encourage Student to work slowly and more independently or administer strategies likely to reduce the symptoms of Student's anxiety.  Because Student's anxiety affected the way she learned in an overarching fashion, failure to address Student's anxiety denied her educational benefit in other areas.  Therefore, the court concludes that the March 2011 and November 2011 IEPs denied Student a FAPE with regard to addressing Student's anxiety.

Student argues that the District also denied her a FAPE in her reading curriculum, as evidenced by her educational stagnation and regression in that area.  The court disagrees.  The District's expert testified that, due to Student's low level of cognitive ability, "[p]rogress would be slow.  It could plateau," particularly when a low-functioning student's curriculum shifts from learning basic facts to synthesizing information and drawing inferences from those facts.  (Tr. at 1932:14.)  While it is true that Student's AGs and STOs are less ambitious with each IEP, Student's academic focus changed from year-to-year.  The District explained at oral argument that between May 2009 and November 2011, the focus of Student's reading curriculum shifted from simple reading skills to reading comprehension and later to drawing inferences from a

reading passage.  Student's "declining reading level" as indicated in her AGs and STOs from year to year merely reflects the fact that Student's reading abilities are lower as the complexity of the reading task increases.

Therefore, the court affirms in part and reverses in part the ALJ's conclusions on whether the District provided an adequate FAPE.  Notably, the court concludes the ALJ was correct to conclude that: (1) the April 2010 IEP denied Student a FAPE with respect to transition services and (2) the March 2010 and November 2011 IEPs denied Student a FAPE by failing to address Student's anxiety.

V.  Placement

Student argues that the ALJ erred by concluding that Student's placement was appropriate in all three years in question.  The ALJ determined that the District's placement decision in all three IEPs was appropriate.  According to the ALJ, Student's argument that she was denied adequate placement confused the issue of placement with that of provision of an adequate FAPE.  Because the ALJ found no procedural or substantive problems with Student's placement, she found for the District.

The educational placement of a child with a disability is made by the "placement team," which consists of parents, teachers, "and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."  34 C.F.R. § 300.116(a).  The final placement decision should be: (1) determined annually; (2) based on the child's IEP; and (3) as close as possible to the child's home.  34 C.F.R. § 300.116(b).  A district violates the IDEA if it proposes placement in "a preexisting, predetermined program" without any flexibility to consider alternatives.  *Target Range Sch. Dist.,* 960 F.2d at 1484.

Student first argues that her placement violated the IDEA because the District had

predetermined her placement prior to each IEP meeting, but her contention is unsupported by the record.  At the May 2009 IEP meeting, the IEP Team placed Student in a "general education classroom with shared instructional assistant support and study hall."  (Ex. D3 at 13.) Thereafter, the IEP Team believed Student needed more educational support, and chose to place Student in "a combination of special education and general education classes with pull out for tutorial and speech and language services."  (Exs. D12 at 16-17, D25 at 14, D36 at 15.)  The placement team chose among several options when making each placement decision and always justified its decision with a reasoned cost/benefit analysis.  Ultimately, the placement team always chose the option which, in its collective opinion, gave Student the best access the material and could provide Student with instruction at the level she was learning.  (Exs. D3 at 13, D12 at 16-17, D25 at 14, D36 at 15.)

The court is also unconvinced that Student's placement was substantively inappropriate. As demonstrated by the IEPs, Student's placement team struck the appropriate balance between providing Student both with special education instruction and an opportunity to socialize with regular-education students in her peer group.  The IEP team's decision to place Student in a mixture of general and special education classrooms is consistent with the IDEA's policy of "mainstreaming," which attempts to educate disabled students with non-disabled students to the fullest extent possible.  *See* 20 U.S.C. § 1412(5)(B).  The court, therefore, affirms the ALJ's finding that Student's placement was appropriate.


## VI.  Remedies

The ALJ ordered the District to provide Student: (1) a comprehensive evaluation to determine Student's present levels and needs; (2) training for District staff on proper IEP

procedure; (3) an IEP meeting following the comprehensive evaluation; (4) two hours of transitional reading compensatory instruction for every week of instruction Student should have received between September 2010 and December 6, 1012; (5) two hours of transitional math compensatory instruction for each week of instruction Student should have received between September 2010 and December 6, 2011; (6) behavioral counseling for one hour per week until Student turns 21 or the parties mutually agree to stop; (7) a driver's education course for student in furtherance of Student's transition plan; and (8) all future instruction should utilize the techniques described by Mr. Larsen in the November 2011 IEP meetings. The court will review the propriety of each award in turn.

If a court finds a school district in violation of the IDEA, the court should "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Payallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). Courts have significant discretion to craft remedies, and commonly award compensatory education which "aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of the IDEA." *Reid v. District of Columbia,* 401 F.3d 516, 518 (Fed. Cir. 2005); *Park, ex. Rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006). When awarding compensatory education, courts are not required to "provide a day-for-day compensation for time missed," but should consider all relevant factors. *Id.; Florence County Sch. Dist. Four v. Carter By and Through Carter,* 510 U.S. 7, 15-16 (1993).

The court vacates all but one aspect of the ALJ's remedies award. First, the court determined that the District met all of its duties to evaluate Student for suspected disabilities, so

requiring the District to administer a time-consuming and costly evaluation is unnecessary. Second, requiring the District to provide a driver's education course is inappropriate. There is no evidence that the District regularly provides drivers education courses, or that it is generally provided in an educational curriculum. Further, Student does not cite and the court finds no authority for the contention that a drivers education is a necessary part of a free adequate public education as contemplated by the IDEA. Third, as the court has already determined, ordering the District to educate Student in all classes using the "Larsen method" exceeded the ALJ's authority, and violated the Supreme Court's command that legal decisionmakers not substitute their own ideas of sound educational policy for that of the school district. Fourth, the court determined that the District provided appropriate instruction in Student's math and reading curriculum, so the ALJ's award of compensatory instruction in those subjects is inappropriate. Fifth, although the District committed several IDEA violations, they were not so numerous or so extreme as to require all District personnel to undergo training on proper IDEA procedure.

Sixth and finally, requiring the District to provide Student with anxiety counseling until she is twenty-one or parties mutually agree counseling is no longer necessary is unwarranted on this record. The school's psychologist and Student's psychologist disagreed regarding whether counseling would be beneficial to Student. Dr. Moore testified at the due-process hearing that frequent anxiety counseling is appropriate only for patients whose anxiety is so acute that they could not leave the house. Given this disagreement, it was the school's responsibility to provide services which curbed Student's anxiety sufficiently to allow her to obtain some educational benefit from school. There is no evidence that Student's anxiety had so significant an effect on her studies as to require an extensive counseling regimen. Further, requiring treatment until student is twenty-one "or the parties mutually determine that counseling . . . is no longer needed"

vests too much authority with Parents in creating the educational plan.  Even if Student's anxiety objectively dissipates to the point where treatment no longer is necessary, the ALJ's order requires the District to continue rendering such services until Parents accept termination of services.  Therefore, the ALJ's order of anxiety treatment is inappropriate.

The court agrees with the ALJ that the District: (1) denied Parents the right to participate by failing to consider privately obtained educational evaluations when drafting the November 2011 IEP; (2) denied Student a FAPE with respect to transition services in the period covered by the April 2010 IEP; and (3) denied Student a FAPE with respect to treating her anxiety and self-management problems between March 2011 and December 2011.  Here, however, the ALJ's remedy for the District's violations went beyond the remedy the court believes appropriate, but the record does not contain enough evidence on several topics to allow this court to craft an appropriate remedy.  Therefore, to gather information and resolve the experts' disagreement, the District should provide Student an independent anxiety evaluation administered by a mutually agreed-upon psychologist.  When the evaluation is complete, the IEP team shall convene a meeting and draft a new IEP which adequately addresses Student's anxiety.  In creating a plan to appropriately address Student's anxiety, the District should consider the Ensroth Report, Updated Buckendorf Report, the opinion of Morris, and the new anxiety evaluation yet to be administered.

Further, Student is entitled to compensatory transition services for the District's failure to provide them between April 2010 and March 2011.  The record, however, contains insufficient evidence for the court to determine what quantity of compensatory transition services is appropriate.  Therefore, the court remands this case so the ALJ may conduct additional administrative proceedings to determine the frequency with which the District usually

administers transition services to disabled students. When the record is fully developed, the ALJ should award Student appropriate compensatory transition services consistent with that evidence.

*Conclusion*

For the aforementioned reasons, the court AFFIRMS in part and REVERSES in part the decision of ALJ Messecar and concludes the following: (1) The District seriously infringed on Parents' right to participate by failing to consider privately obtained educational evaluations when drafting the November 2011 IEP; (2) denied Student a FAPE by failing to provide adequate transition services during the period covered by the April 2010 IEP; (3) denied Student a FAPE with respect to treating her anxiety and self-management problems during the period between March 2011 and December 2011. The court rules in favor of the District on all of Student's remaining claims.

Therefore, the court REMANDS this case for additional administrative proceedings consistent with this opinion in order to craft an appropriate remedy for the IDEA violations outlined herein.

IT IS SO ORDERED

DATED this 9th day of June, 2014.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge